UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH WILLIS,<br><br>    Plaintiff,<br><br>    v.<br><br>ENTERPRISE DRILLING FLUIDS, INC., et al.,<br><br>    Defendants. | Case No.: 1:15-cv-000688 - JLT<br><br>ORDER GRANTING DEFENDANT DRILTEK'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 47) |

Kenneth Willis asserts he was jointly employed by defendants Enterprise Drilling Fluids, Inc., and Driltek, Inc. and alleges that defendants are liable for wage and hour violations of California law and the Fair Labor Standards Act. (Doc. 33) Driltek asserts that it was not a joint employer and that the plaintiff is unable to succeed on his claims against Driltek for this reason. Accordingly, Driltek seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 47) For the reasons set forth below, the Court **GRANTS** Driltek's motion for summary judgment.

**I.      Background**

Plaintiff was employed as a mud engineer, which required him to take samples from a drilling fluid tank, also known as the "mud tank," and preparing reports. (Doc. 33 at 6, ¶15) He reports that a specific degree was not required to perform the work, but employees spent "approximately 3 months[] training in 'mud school.'" (*Id.*)

Plaintiff alleges that "mud engineers were required to work 24-hour shifts, often for periods of

two weeks or more without a day's rest" at worksites for Enterprise and Driltek.  (Doc. 33 at 6, ¶ 15)  He asserts the workers "were told to sleep when they could in the work trailer at the drilling site," but the engineers "were required to respond to calls at any time, even if sleeping."  (*Id.*)  Plaintiff alleges the "[m]ud engineers are not told that they can take rest periods, are not informed about any rest period policy, and routinely are required to work through four hour periods with no actual rest period during which they are relieved of all duty for at least 10 minutes."  (*Id.*, ¶ 18)  He asserts the mud engineers "worked for hours for which they were not compensated at least the minimum wage," including overtime, and "Defendants regularly and systematically, as a policy and practice, failed to pay Plaintiff and class members the wages due them."  (*Id.*, ¶¶ 20-21)  Accordingly, Plaintiff asserts the defendants have violated the Fair Labor Standards Act and he seeks to represent a class defined as:

> All mud engineers who worked for DrilTek, Inc. in the United States within the three years preceding the filing of this action to the date of trial who worked hours for which they were not compensated at the minimum wage or worked more than 40 hours during a week and were not fully compensated for this time worked over 40 hours per week at the properly calculated overtime rate (the "FLSA Collective Class").

(*Id.* at 22, ¶¶ 108)

Plaintiff also contends the defendants are liable for unlawful business practices in violation of California law, including: failure to pay minimum wage in violation of Cal. Labor Code §1182.12; failure to pay wages in violation of Cal. Labor Code §§ 201, 202, and 203; failure to pay compensation for meal and rest periods in violation of Cal. Labor Code § 226.7; failure to provide accurate and complete wage statements in violation of Cal. Labor Code §§ 226 and 1174; failure to reimburse for business expenses in violation of Cal. Labor Code § 2802; and violations of Cal. Bus. & Prof. Code § 17200.  (*See generally* Doc. 33)  In pursuing these causes of action, Plaintiff seeks to represent a "California Class," including:

> All current and/or former employees that worked for Defendants as "mud engineers" or "mud engineer trainees" in California within the four years preceding the filing of this action, or shorter statute of limitations as determined by the Court, through the date of trial.

(*Id.* at 33, ¶ 116)

Plaintiff contends that Enterprise and Driltek "acted as co-employers and/or joint employers" for him and members of the proposed classes, and as such both entities are liable for violations of the

FLSA and California law.  (Doc. 33 at 2, ¶ 6)  Driltek argues it was not a joint employer and seeks a determination that Enterprise alone was Plaintiff's employer while he worked as a mud engineer.  (Doc. 47)

## II.     Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c).  The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  Evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

### III.   Plaintiff's Request under Rule 56(d)

Opposing Driltek's motion for summary judgment, Plaintiff contends the motion should be denied because Driltek "refused to comply with its discovery and disclosure obligations in this case and has refused to produce documents that it clearly has access to that are directly relevant and material to the issue of the 'control' exercised by it over the drilling operations, including the mud engineers, of oil wells it supervised."  (Doc. 48)

Under Rule 56(d) of the Federal Rules of Civil Procedure, the Court must deny or continue a motion for summary judgment if an opposing party can demonstrate that "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d).  The Ninth Circuit explained that Rule 56(d) "require[es], rather than merely permit[s], discovery where the nonmoving party has not had the opportunity to discover information that is essential to its opposition." *Metabolife*

*Int'l Inc. v. Wornick*, 264 F.3d 832, 849 (9th Cir. 2001).

The opposing party "must identify the specific facts that further discovery would reveal and explain why these facts would preclude summary judgment." *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006). In order to be entitled to relief under Rule 56(d), "parties opposing a motion for summary judgment must make '(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists.'" *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129-30 (9th Cir. 2004) (quoting *VISA Int'l Serv. Assoc. v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986). "The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001); *see also Garrett v. San Francisco,* 818 F.2d 1515, 1518 (9th Cir. 1987) ("an opposing party must make clear what information is sought and how it would preclude summary judgment").

In addition, the requesting party must demonstrate diligence in previously pursuing the discovery that he now asserts is necessary. *See Pfingston v. Ronan Engineering Co.*, 284 F.3d 999, 1005 (9th Cir. 2002) ("The failure to conduct discovery diligently is grounds for the denial of a Rule 56[d] motion"). The Ninth Circuit determined that "courts have wide latitude in controlling discovery." *United States v. Johnson Controls, Inc*. 457 F.3d 1009, 1023 (9th Cir. 2006). A decision to not continue a hearing for further discovery under Rule 56(d) is "reviewed for abuse of discretion." *Swoger v. Rare Coin Wholesalers*, 803 F.3d 1045, 1047 (9th Cir. 2015).

Plaintiff's counsel, Lonnie C. Blanchard III, asserted that Plaintiff served requests for production of documents that were "directly relevant to the extent of the control exercised by Driltek over the drilling operations, including the mud engineers, at drill sites that they were responsible for supervising." (Doc. 56 at 2, Blanchard Decl. ¶ 2) Mr. Blanchard reported the defendants failed to produce mud men reports, daily operational summaries, or emails that Plaintiff believed exist related to the work performed. (*See id.* at 2-4) However, this does not establish that *additional* discovery should be permitted under Rule 56. At most, it demonstrates a discovery dispute, which was not brought to the Court's attention prior to the filing of Plaintiff's opposition for summary judgment. Indeed, the failure

1 to seek Court intervention with the dispute prior to the filing of the motion does not show diligence in
2 seeking the discovery Plaintiff now argues was necessary to oppose summary judgment.
3      Regardless, at the hearing Plaintiff reported the documents were produced by the defendants
4 and it did not appear that the documents would impact the ruling on this motion.  Accordingly, it
5 appears the discovery dispute between the parties has been resolved.  Plaintiff's request for discovery
6 under Rule 56(d) is **DENIED**.
7 **IV.     Evidentiary Objections**
8      In resolving a motion for summary judgment, the Court can consider only admissible evidence.
9 *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e);
10 *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  Pursuant to Rule 56(c) of
11 the Federal Rules of the Civil Procedure, "an affidavit or declaration used to support or oppose a
12 motion must be made on personal knowledge, set out facts that would be admissible in evidence, and
13 show that the affiant or declarant is competent to testify on the matters stated." *See also Block v. City of*
14 *Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (holding that it was an abuse of discretion for the
15 district court, at the summary judgment stage, to consider information from an affidavit based on
16 inadmissible hearsay rather than the affiant's personal knowledge).
17      Plaintiff objects to statements in the declarations of Amanda Gillies, James Fox, Jesse Hedge,
18 and Rodney Wolford on three grounds: (1) lack of personal knowledge, (2) impermissible opinion and
19 conclusion and (3) relevance.  (*See generally* Docs. 52, 53, 54, and 55)  Similarly, Driltek objects to
20 statements in the declarations offered by Plaintiff, Thomas Cruise and Plaintiff's counsel, Lonnie
21 Blanchard III.  (*See generally* Doc. 57-3)
22      To the extent that the Court relies upon any statements below, the Court has determined the
23 declarants set forth sufficient facts in the declaration to support that they have personal knowledge of
24 the information to which they attest through observations and experience.  *See e.g., Barthelemy v. Air*
25 *Lines Pilots Assoc.*, 897 F.2d 999, 1018 (9th Cir. 1990) (personal knowledge and competence to testify
26 may be inferred from the facts stated in a declaration).  Rather, the only testimony the Court has
27 considered from the witnesses are those opinions or inferences that are "(a) rationally based on the
28 perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the

determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *See* Fed. R. Evid. 701.

Moreover, objections as to the relevance of the statements are inappropriate, because the Court must determine whether a fact is relevant and material as part of "the summary judgment standard itself." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Accordingly, objections on these grounds are **OVERRULED**. To the extent that statements offered by either party are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis.[1] *See Burch*, 433 F. Supp.2d at 1119. Rather, the Court's analysis herein relies only on evidence it has deemed admissible.

## V.     Discussion and Analysis

California's Industrial Welfare Commission identifies an employer as one who "employs or exercises control over the wages, hours or working conditions of any person." *Martinez v. Combs*, 49 Cal.4th 35, 64 (2010). According to Wage Order 14, "employ" means "to engage, suffer or permit to work." *Id.* The California court determined, "A proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so." *Id.* at 69.

The Fair Labor Standards Act utilizes a definition similar to California law and an entity "employs" a person if it "suffers or permits" the individual to work. 29 U.S.C. § 203(g). This definition of "employment" rejects the common-law definition of employment and applies "to many persons and working relationships which, prior to [the FLSA], were not deemed to fall within an employer-employee category." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947); *see also Martinez*, 49 Cal.4th at 58 ("Not requiring a common law master and servant relationship, the widely used 'employ, suffer or permit' standard reached irregular working arrangements the proprietor of a business might otherwise disavow with impunity").

Under California law and the FLSA, joint employment exists where an employee works for

---

[1] In particular, the Court rejects the parts of the plaintiff's declaration that contradict his earlier sworn testimony. The plaintiff is not permitted to create a dispute material issue of fact by contradicting his sworn testimony. *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).

7

more than one employer at the same time, or "performs work which simultaneously benefits two or more employers." 29 C.F.R. § 791.2(b). Under the FLSA,

> [A] joint employment relationship generally will be considered to exist in situations such as:
> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
>
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*Id.* (footnotes and citations omitted). Similarly, under California law, where "an employer sends an employee to work for another party… and where both have the right to control the employee's activities, dual employment exists." *Cnty. of Los Angeles v. Workers' Comp. Appeals Bd.*, 30 Cal. 3d 391, 405 (1981).

To determine the nature of an employment relationship, the Ninth Circuit determined that a court must look to the "economic reality" of the situation. *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1992). Under this test, the Court must consider four factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983). Likewise, under California law, the courts consider "the totality of the working relationship of the parties," including:

> payment of salary or other employment benefits and Social Security taxes, the ownership of the equipment necessary to performance of the job, the location where the work is performed, the obligation of the defendant to train the employee, the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, the authority to establish work schedules and assignments, the defendant's discretion to determine the amount of compensation earned by the employee, the skill required of the work performed and the extent to which it is done under the direction of a supervisor, whether the work is part of the defendant's regular business operations, the skill required in the particular occupation, the duration of the relationship of the parties, and the duration of the plaintiff's employment.

*Vernon v. State*, 116 Cal.App.4th 114, 125 (2004). In *Vernon*, the court acknowledged that the factors

are "intertwined" and "cannot be applied mechanically as separate tests. *Id.* However, "[o]f these factors, the extent of the defendant's right to control the means and manner of the workers' performance is the most important." *Id.* (citation omitted).

### A.     Power to hire

Plaintiff testified that he applied for work with both Enterprise and Driltek. (Doc. 47-6 at 40-41) Though he submitted a resume to Driltek to work as a company man (*Id.* at 41, Depo. 139:15-25), he "never got a response" and was not interviewed by anyone at Driltek. (*Id.*; *see also* Doc. 47-6 at 42, Depo. 144:10-16)

When Plaintiff applied for work with Enterprise, he completed an application, which he "gave …to the secretary in the front office" of Enterprise. (Doc. 47-6 at 40-41, Depo. 138:4- 139:6) Plaintiff reported he previously worked for the company, and was not required to interview when he applied to return Enterprise. (*Id.* at 41, 139:10-14) Instead, Jim Joslyn simply called Plaintiff and asked him to "come back." (*Id.*) Plaintiff admits that "Driltek didn't have [any]… involvement in [his] hiring with Enterprise." (*Id.* at 65, Depo. 188:10-23) Therefore, this factor weighs against a finding that Driltek was a joint employer.

### B.     Control over rate and method of payment

Ms. Gillies reported that "Enterprise exclusively determined the rate and manner in which Willis was paid." (Doc. 47-4 at 3, Gillies Decl. ¶ 8) Plaintiff reported he was paid directly by Enterprise. (Doc. 47-6 at 46, Depo. 156:3-8) In addition, Plaintiff testified that Enterprise provided him with a $600 per month stipend to pay for the use of his personal car on the job. (Doc. 47-6 at 57-58, Depo. 168:24-169:7) Also, Enterprise provided Plaintiff with health insurance and a 401(k). (*Id.* at 58, Depo. 169:11-17)

On the other hand, Driltek never paid Plaintiff and, as far as he knew, Driltek had no input as to his rate of pay. (Doc. 47-6 at 46, Depo. 156: 11-19) Plaintiff testified that he did not get any benefits from Driltek such as the 401(k) provided by Enterprise. (Doc. 47-6 at 58, Depo. 169:18-20) Consequently, Enterprise's authority over Plaintiff's pay and benefits weighs against a finding of joint employment.

///

### C. Training

Plaintiff testified that Enterprise provided training on how to be a mud man. (Doc. 47-6 at 21-22) According to Plaintiff, he trained "on the job for a year" with "a senior mud man." (*Id.* at 21-22, Depo. 105:13-14, 106:21-23; *see also* 165:14-16) Enterprise gave Plaintiff a book including information on "various chemical additives" and how many pounds per barrel to use under different circumstances. (*Id.*, Depo. 105:1-6, 106:16-20) After the year of training, Enterprise "sent [him] to Mud Tech Laboratories in Houston for a month," where he earned "a certificate for being a mud man." (*Id.*, Depo. 105:14-20)

In contrast, Plaintiff reported that Driltek did not provide any training on how to be a mud man. (Doc. 47-6 at 54-55, Depo. 165:25-166:2) Driltek did not pay for Plaintiff to attend mud school. (*Id.*, Depo. 166:3-6) However, "Driltek company men/drill site managers … arrange[d] for "H2S (Hydrogen Sulfide) training at the drill site," which Plaintiff was required to attend. (Doc. 49 at 8-9, ¶ 32) However, the Court finds that this single occurrence of safety training on the job site is not the equivalent of the training provided for Plaintiff to acquire the skills necessary to perform his duties as a mud man. Thus, the training Plaintiff received from Enterprise supports a conclusion that Driltek was not Plaintiff's employer.

### D. Tools and equipment

Enterprise provided Willis an employee handbook, a safety manual, a company manual and a code of employee conduct when he was hired. (Doc. 47-6 at 49) Enterprise also provided Plaintiff with his "trailer, testing equipment and various mud materials." (Doc. 49 at 13, Willis Decl. ¶ 62; *see also* Doc. 47-6 at 48 [Enterprise provided "all [his] mud testing equipment])

Plaintiff asserts that "[a]ll the other tools, equipment and materials on the drill site were arranged for, scheduled and ordered by Driltek's company men/drill site managers." (Doc. 49 at 13, ¶ 62) However, Plaintiff does not contend that Driltek provided any equipment that *he* used to perform his duties on the drill site. (*See id.*) To the contrary, at his deposition Plaintiff testified Driltek *did not* provide tools or equipment for his use. (Doc. 47-6 at 48, Depo. 159:8-12) Because the tools and equipment Plaintiff used were provided only by Enterprise, this factor weighs against a finding that Driltek was a joint employer.

### E. Maintenance of employment records

Under the FLSA, it is mandatory only that an employer maintain employment records. Actual control over, and not merely access to, employment records supports a determination that a company is a joint employer. *See, e.g. Zhao*, 247 F. Supp. 2d at 1160 ("access to. . . payroll records. . . cannot and should not be equated with. . . control, either direct or indirect, over. . . payroll records"). To Plaintiff's knowledge, Driltek maintained no employment records for him. (Doc. 47-6 at 66-67) In addition, James Fox, President of Driltek, asserts Driltek did not maintain employment records or have access to Plaintiff's records. (Doc. 47-5 at 4, Fox Decl. ¶ 12) Accordingly, this factor weighs against a determination that Driltek was a joint employer with Enterprise for Plaintiff.

### F. Supervision and control over work schedules and conditions of employment

Plaintiff contends that Driltek, "through its on-site 'drilling supervisor' (aka the 'company man'), exercised control over Plaintiff's hours and working conditions." (Doc. 48 at 7) On the other hand, Driltek argues it does not have sufficient control over Plaintiff's working conditions such that it is a joint employer. (Doc. 47-1 at 21-23)

#### 1. Drill site assignments and schedule

Plaintiff testified that Jim Joslyn and Bob Patty, Enterprise personnel, determined where Plaintiff worked, including the drill sites to which he was assigned. (Doc. 47-6 at 12-13, Depo. 85:21-86:2) He reported Mr. Joslyn or Mr. Patty would also tell Plaintiff if the company men on the job sites he would work were "requesting 24-hour service." (*Id.* at 13, Depo. 86:1-4) However, Plaintiff testified that it was Enterprise who established his work schedule. (*Id.* at 47, Depo. 158:16-20)

#### 2. Performance of duties

Jesse Hedge and Rodney Wolford, Well Site Coordinators (also known as "company men") with Driltek, provided declarations in which they describe the extent of their responsibilities on the job sites. According to Mr. Hedge, he worked "as a logistics consultant or 'traffic director,'" to make projects "run[] as smoothly as possible." (Doc. 47-3 at 4, Hedge Decl. ¶ 2) Mr. Hedge explained that in this capacity, he "advise[d] various service providers where on the drilling sight to place their equipment to limit congestion and to maximize everyone's ability to operate in a safe and efficient manner." (*Id.*, ¶ 3) Both Mr. Hedge and Mr. Wolford assert they "do not have the power or authority

to exercise control over … the specific tasks Drilling Fluids Engineers are to perform and how they are to perform those tasks, and/or the working conditions in general for Drilling Fluids Engineers." (Doc. 47-3 at 5, Hedge Decl. ¶ 5; Doc. 47-3 at 10, Wolford Decl. ¶ 5) Mr. Hedge and Mr. Wolford assert they "did not and could not instruct Willis when and where to perform work." (*Id.* at 6, 12, Hedge Decl. ¶ 11; Wolford Decl. ¶ 11) The company men also report they "could not… direct Willis how to test mud samples as a Mud Engineer…; direct Willis how to fill out his reports on the mud properties for the samples he tested…; [or] direct Willis how to instruct other crew hands at the drilling sites as to what chemicals to add to the mud to achieve proper viscosity and weight…." (*Id.* at 6, 12, Hedge Decl. ¶ 9; Wolford Decl. ¶ 9) However, Mr. Hedge asserts "[b]ased on [his] experience," he believed "that various other subcontractors at the drilling site could request that Willis run tests on the mud as a Mud Engineer for Enterprise." (*Id.* at 7, Hedge. Decl. ¶ 7)

On the other hand, according to Plaintiff, the Driltek company men "had the power to and did schedule . . . when to come down and observe the well, when to help other contractors, when to take mud samples, when to do mud tests, when to provide mud reports and when to provide materials to be added to the mud, and when to order water/vacuum trucks." (Doc. 49 at 7, Willis Decl. ¶ 25) Plaintiff asserts the company men "could and sometimes did call [him] and tell [him] to do things in the middle of the night." (*Id.* at 8, ¶ 28) Further, Plaintiff asserts the company men instructed Plaintiff to tell them when he "was going to leave the drill site in case they needed [him] for something." (*Id.*, ¶ 29) Plaintiff testified that after he ran mud tests, he would discuss the results with the company man to determine whether the company man wanted "to add anything or quit adding anything." (Doc. 47-6 at 20, Depp. 17-21; See Doc. 49 at 12-13, Plaintiff's Dec ¶¶ 54-56, 60-61) He'd take this instruction and tell the derrick hands what they needed to add, if anything. (Doc. 47-6 at 38)

Consequently, there is conflicting information regarding whether the company men had the authority to tell Plaintiff *when* to perform mud tests, and what to do with the results that Plaintiff obtained. However, it does not appear the company men told Plaintiff *how* to do the mud tests.

On the other hand, in his declaration, Plaintiff lists 19 instructions he says were given to him by the company man. (Doc. 49 at 11-13, Plaintiff's Dec ¶¶ 43-61) However, he provides little detail about these instructions and the Court cannot determine whether any of these instructions were given more

than one time over the approximately three years he worked for Enterprise (Doc. 47-6 at 39). Thus, this evidence is so vague as to deprive the Court of the ability to evaluate its impact on the alleged joint employment relationship and does not meet his burden of establishing a dispute of material fact.

Moreover, 19 instructions during the course of 30 to 36 months of employment do not constitute day-to-day supervision and seem to be isolated and incidental to the running of the drill rig. In addition, many of these instructions don't appear to have anything to do with supervision of Plaintiff as opposed to supervision of the drill site. For example, Plaintiff reports that the company man told him where to park his trailer and his personal vehicle, to move his trailer or personal vehicle, where to store his mud materials on the site, to watch another vendor who was trying to correct a well problem, when he was needed on site and when he was not needed at the site when there was a drilling rig break down. In addition, as the start of the drilling effort, the company man would call all of the contractors together for a "spud" meeting at which the company man explained the drilling plan and well program, he described any unique information about the drill site, he expressed how long he expected the drilling project to last and whether he anticipated any problems. Plaintiff does not explain how these instructions demonstrate control over the performance of his duties.

### 3. Drug testing

When Plaintiff was hired by Enterprise, he agreed to submit to drug testing. (Doc. 47-6 at 53, Depo. 164:2-3; Doc. 47-6 at 80) The company men for Driltek report they did not have authority to "have Willis submit to drug testing as a Mud Engineer for Enterprise." (Doc. 47-3 at 7, Hedge Decl. ¶ 12; *id.* at 13; Wolford Decl. ¶ 12)

During Plaintiff's deposition, he testified that one time everyone on the job site was required to "take a drug test on the location because they found drugs on location." (Doc. 47-6 at 53) As a result, "everyone on the lease had to run in and go to a set area and do a pee test." (*Id.*) Plaintiff did not believe the drug test was administered by either Enterprise or Driltek, but was "pretty sure" that the test was conducted by Linn Energy.[2] (*Id.* at 53-54)

---

[2] Opposing summary judgment, Plaintiff now asserts in his declaration that the drug test was required by Driltek, and the company men "locked down the entire site." (Doc. 49 at 3, ¶¶ 9, 31) It appears this new statement is offered purely to support a determination that Driltek exerted additional control over Plaintiff on the job site, and clearly contradicts his prior testimony. For these reason, the Court declines to give any weight to Plaintiff's statement in his declaration that

#### 4.      Transfer, discipline, and discharge

Plaintiff testified that a company man "could run [him] off" if he did not do what was expected or he disagreed with the company man. (Doc. 47-6 at 45, 155:12-18) Plaintiff explained in his declaration that he knew company men "have the right to 'run off' or remove any people on the drill site for bad behavior or bad performance" because he witnessed "situations when people on the drill site had physical fights or angry personal arguments and the Drill Site company men/drill site managers would make them stop, and, in certain cases, have one or both of them removed from the drill site." (Doc. 49 at 10, Willis Decl. ¶ 38)

Significantly, Plaintiff fails to explain whether the individuals he saw company men remove from a job site worked for entities other than Driltek, such as other Enterprise employees who were assigned to the location. Indeed, Driltek company men assert they did not have the power to transfer Plaintiff from a job site. (Doc. 47-3 at 5-6, Hodge Decl. ¶¶7, 9; *id.* at 11-12, Wolford Decl. ¶¶ 7, 9) However, Plaintiff saw Bob Patty come to drill sites and "swap out mud men" after Driltek company men expressed being "fed up." (Doc. 49 at 11, Willis Decl. ¶ 40) Thus, whether Driltek company men had direct authority to transfer mud men such as Plaintiff, it appears they could request Enterprise transfer a mud man.

On the other hand, there is no evidence that the company men had the authority to discipline Plaintiff. For example, there is no indication that a transfer to another job site would, in fact, result in any disciplinary action by Enterprise, such as a negative impact upon Plaintiff's salary or working conditions. There is no evidence that any one drill site was preferable to any other. Furthermore, there is no evidence that Driltek company men had the authority to terminate Plaintiff's employment. Indeed, Plaintiff testified Driltek was not involved with his decision to terminate his employment with Enterprise. (Doc. 47-6 at 65, Depo. 188:10-23)

#### 5.      Evaluations

Plaintiff testified that Mr. Patty checked with the company men regarding how Willis was performing. (Doc. 47-6 at 45-46) However, it is unclear what Mr. Patty's purpose in gathering this

---

Driltek directed Plaintiff to submit to the drug test.  *See Van Asdale v. Int'l Game Tech*., 577 F.3d 989, 998 (9th Cir. 2009); Fn. 1.

information was to evaluate Plaintiff's workplace performance or to ensure Enterprise personnel was providing good customer service to Driltek and/or Berry/Linn.

On the other hand, Plaintiff notes in his declaration that at the completion of his work on a drill site, he'd sit with the company man who'd tell the plaintiff what he thought of the plaintiff's work. (Doc. 49 at 9 Plaintiff's Dec ¶ 33) However, he admits he never received a written evaluation from Driltek, though he reports that employees of other contractors did. (Doc. 49 at 9 Plaintiff's Dec ¶ 34) Plaintiff provides no detail of the "meeting" with the company man such to allow the Court to evaluate whether this "meeting" was merely one worker telling another worker he liked his work ethic or a more formalistic interaction between a supervisor and his subordinate. Thus, the Court finds this evidence does not create a genuine dispute of material fact.

### G. Permanence of working relationship

Permanence in the working relationship between a company and the laborer suggests joint employment. *Torres- Lopez v. May*, 111 F.3d 633, 644 (9th Cir. 1997). Here, there is no indication that there was any permanence in the working relationship between Plaintiff and Driltek, as Driltek had no input on which drilling locations Plaintiff worked at, or in his decision to leave Enterprise. (*See* Doc. 47-6 at 12-13, 65; Depo. 85:21-86:2, 188:10-23)

### H. Conclusion

From the evidence presented, the factors set forth by the Ninth Circuit and California courts weigh against a determination that Driltek is a joint employer. Driltek was not involved in the decision to hire Plaintiff, was not involved in setting his wages or assigning the locations to which he worked, and did not keep any employment records for Plaintiff. In addition, Driltek did not provide Plaintiff with the training or equipment he required to perform the duties as a mud man. Finally, Plaintiff does not show any evidence that Driltek had authority to discipline or discharge him.

At most, Plaintiff presents evidence that shows the Driltek company men had very limited supervision and control over Plaintiff's working conditions, to the extent they were able to ask him to perform mud tests and requests that he be transferred to another job site. Even where an entity is "very specific about how it wanted its work performed and checked to ensure that its standards were met and the [individuals'] overall performance adhered to [company] specifications," the indirect control was

not sufficient to render the company a joint employer under federal law.  *See Moreau v. Air France*, 356 F.3d 942, 950-51 (9th Cir. 2003).  The Ninth Circuit observed that "even if… actions in specifying the work to be performed and following up to ensure adequate performance do constitute some control over the work or working conditions of the employee,…. the regulations do not say that a joint employment relationship is necessarily formed." *Id.* at 951 (internal quotation marks, citation omitted).  Instead, the court is charged with looking at the "totality" of an alleged employment relationship.  Here, factors for "the economic realities" and "totality of the circumstances" tests show Driltek lacked control over the performance of Plaintiff's job duties and his working conditions.

### VI.     Conclusion and Order

Plaintiff fails to present evidence sufficient to support a conclusion that Driltek is a joint employer, and as such his claims against the entity for violations of federal and state employment law must fail.

Accordingly, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (Doc. 47) is **GRANTED**.

IT IS SO ORDERED.

Dated:   **August 26, 2016**                            /s/ Jennifer L. Thurston
                                                                          UNITED STATES MAGISTRATE JUDGE